# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| COREY BARNETT, Individually and On Behalf of All Others Similarly Situated, | Case No.: 1:18-cv-1580 |
| Plaintiff, | |
| vs. | **JURY DEMANDED** |
| THE FINISH LINE, INC., GLENN S. LYON, TORRENCE BOONE, RICHARD P. CRYSTAL, CATHERINE A. LANGHAM, STEPHEN GOLDSMITH, WILLIAM P. CARMICHAEL, SAMUEL M. SATO, and FAISAL MASUD, | **Class Action** |
| Defendants. | |

Plaintiff Corey Barnett ("Plaintiff"), by his undersigned attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this action, behalf of the public stockholders of The Finish Line, Inc. ("Finish Line" or the "Company") against the Company and the members of its Board of Directors (the "Board" or "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, and to enjoin the vote on a proposed merger, pursuant to which the Company will be acquired by JD

Sports Fashion Plc ("JD Sports") through JD Sports' wholly-owned subsidiary Genesis Merger Sub, Inc. ("Merger Sub") (the "Proposed Merger")

2.     On March 26, 2018, the Company issued a press release that announced it had entered into an Agreement and Plan of Merger (the "Merger Agreement") with JD Sports, pursuant to which each of the Company's issued and outstanding Class A common shares will be converted into the right to receive $13.50 in cash (the "Merger Consideration"). The Proposed Merger is valued at approximately $558 million.

3.     On May 7, 2018, the Company filed a Registration Statement (the "Registration Statement") with the SEC. The Registration Statement, which recommends that the Company's shareholders vote in favor of the Proposed Merger, omits or misrepresents material information concerning, among other things: (a) the Company's financial projections, including the financial projections relied upon by the Company's financial advisors, PJ Solomon Securities, LLC ("Solomon") and Houlihan Lokey Capital, Inc. ("Houlihan"); (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by Solomon and Houlihan; and (iii) potential conflicts of interest.

4.     In short, unless remedied, the Company's shareholders will be forced to make a voting decision on the Proposed Merger without full disclosure of all material information concerning the Proposed Merger being provided to them. Plaintiff seeks to enjoin the shareholder vote on the Proposed Merger unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.     This Court has jurisdiction over Defendants because each defendant is either a corporation that conducts business in and maintains operations within this District or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Finish Line is incorporated in this District.

## THE PARTIES

8.     ***Plaintiff Corey Barnett*** is, and has been at all times relevant hereto, a stockholder of Finish Line.  *See* attached certification.

9.     ***Defendant Finish Line*** maintains its executive offices at 3308 North Mitthoeffer Road, Indianapolis, Indiana 46235.

10.     ***Defendant Glenn S. Lyon*** ("Lyon") is the Chairman of the Board of the Company. Lyon has served as Chief Executive Officer ("CEO"), Executive Vice President of the Company, and Executive Chairman.

11.     ***Defendant Torrence Boone*** ("Boone") is a director of the Company.

12.     ***Defendant Richard P. Crystal*** ("Crystal") is a director of the Company.

13.     ***Defendant Catherine. A. Langham*** ("Langham") is a director of the Company.

14.     ***Defendant Stephen Goldsmith*** ("Goldsmith") is a director of the Company.

15.     ***Defendant William P. Carmichael*** ("Carmichael") is a director of the Company.

16.     ***Defendant Samuel M. Sato*** ("Sato") is the CEO and a director of the Company. Sato also served as President of the Company.

17.     ***Defendant Faisal Masud*** ("Masud") is a director of the Company.

3

18.    Defendants Lyon, Boone, Langham, Goldsmith, Carmichael and Sato are collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

19.    Plaintiff brings his claim as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Finish Line common stock (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.    Plaintiff's claim is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

21.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of March 23, 2018, there were approximately 41,298,819 shares of Company common stock issued and outstanding. All members of the Class may be identified from records maintained by Finish Line or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

22.    Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, among inter alia:

(a)    Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct;

(b)    Whether Defendants have disclosed and will disclose all material facts about the Proposed Merger to Finish Line shareholders;

(c)     Have the Individual Defendants breached their fiduciary duties of loyalty and/or care with respect to Plaintiff and the other members of the Class in connection with the Proposed Merger; and

(d)     Whether Plaintiff and the other members of the Class would be irreparably harmed were the Proposed Merger complained of herein consummated.

23.     Plaintiff will fairly and adequately protect the interests of the Class and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

25.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**Background Of The Merger**

26.     In August of 2016, Defendant Sato and Mr. Peter Cowgill, Executive Chairman of JD Sports, attended the Olympic Games in Rio de Janeiro.  At a brief meeting at that time, Mr. Cowgill and Defendant Sato had a conversation regarding potential consideration of a future strategic discussion, but no specific proposal was discussed.

27.     On April 20, 2017, at the invitation of Mike Ashley, Chief Executive of Sports Direct International plc ("Sports Direct"), Defendant Sato, Ed Wilhelm, Finish Line's CFO, and Chris Eck, Finish Line's General Counsel, met with Mr. Ashley and other representatives of Sports Direct for dinner in Indianapolis.  Mr. Ashley raised the possibility of collaboration between Finish

Line and Sports Direct in the U.S. and the U.K. Mr. Ashley advised Finish Line's representatives at that time that Sports Direct had no interest in acquiring Finish Line and did not seek representation on Finish Line's Board.

28.     On April 25, 2017, Finish Line's Board met by teleconference to consider the commercial opportunity proposed by Sports Direct. On April 26, 2017, at the direction of the Board, Defendant Sato sent a communication to Sports Direct declining to pursue discussions on the proposed collaboration.

29.     On May 5, 2017, a representative of a U.K. consulting firm representing Sports Direct wrote to Defendant Sato on behalf of Sports Direct seeking further discussion concerning the proposed collaboration between Sports Direct and Finish Line on opportunities both inside and outside the U.S., suggesting a meeting in the U.K.

30.     In response to Sports Direct's May 5, 2017 suggestion of a meeting, Finish Line advised Sports Direct's representative that, in advance of an in-person meeting, Finish Line would require Sports Direct to execute a customary standstill and nondisclosure agreement. Mr. Eck provided a draft of such agreement on May 24, 2017 to Sports Direct's representative. Sports Direct never signed the agreement.

31.     Concurrently in late May 2017, Finish Line's management and members of its Board deliberated on whether Finish Line should adopt a shareholders rights plan in light of Sports Direct's accumulation of a significant economic interest in Common Shares, as publicly disclosed in its Schedule 13D filings. After extensive discussion, in view of the facts that Sports Direct's investment was a purely derivative economic position and that Finish Line had other deterrents to a hostile takeover bid available under Indiana law and its governing documents, and considering

potential adverse consequences of adopting a rights plan, Finish Line management decided not to recommend adoption of a rights plan to the Board at that time.

32.     In late May 2017, Mr. Cowgill contacted Defendant Sato and suggested JD Sports and Finish Line initiate a formal dialogue with respect to a potential collaboration or business combination. Defendant Sato agreed to arrange a video conference, which was later scheduled for June 7, 2017.

33.     On June 7, 2017, Defendants Sato and Lyon and Mr. Cowgill participated in a video conference to gauge JD Sports' interest in a potential business combination. Mr. Cowgill and the Finish Line representatives agreed to continue discussions and to plan an in-person meeting.

34.     On July 14, 2017, counsel for Sports Direct sent a letter to Mr. Eck disclosing Sports Direct's intention to acquire more than $161.5 million in Common Shares, which would exceed a regulatory threshold under U.S. antitrust law, and Mr. Ashley's intention to file a notification with U.S. antitrust regulators. The letter further advised Mr. Eck that the filing by Mr. Ashley with U.S. antitrust regulators may cause Finish Line to be required to make a filing under U.S. antitrust regulations.

35.     On July 27, 2017, Finish Line entered into a mutual confidentiality and standstill agreement with JD Sports (the "Confidentiality Agreement"). Over the next several weeks, JD Sports continued to evaluate a potential business combination with Finish Line based largely on publicly available information. Finish Line shared limited nonpublic information with JD Sports, mostly consisting of information about Finish Line's strategic initiatives.

36.     On August 2, 2017, Mr. Cowgill and Defendant Sato had a telephone call to plan an in-person meeting of management representatives of both companies on September 6, 2017.

37.     On August 21, 2017, Sports Direct further amended its Schedule 13D filed with the SEC, disclosing that it had acquired direct ownership (for the first time), including voting and disposition power, of 3,174,200 Common Shares (representing approximately 7.91% of the Common Shares). Over the preceding weeks, Sports Direct had, in multiple amendments to its Schedule 13D, disclosed a gradual increase of its economic exposure to Common Shares through CFDs.

38.     By August 22, 2017, Sports Direct's Schedule 13D, as amended, reported an economic interest through CFDs in 8,697,248 Common Shares (representing, in the aggregate with the Common Shares beneficially owned by Sports Direct, an interest in approximately 29.6% of the outstanding Common Shares) and further reported having sold put options (representing the obligation of Sports Direct to purchase shares at the option of the buyer of such put options; we refer hereinafter to sold put options as "short put options") for an additional 4,346,300 Common Shares.

39.     On August 25, 2017, Finish Line's Board held a special meeting to review Finish Line's financial results for its second fiscal quarter and to consider adoption of a shareholders rights plan.

40.     On August 29, 2017, Mr. Cowgill and Defendant Sato had a telephone call to refine plans for the anticipated September 6 in-person meeting.

41.     On September 6, 2017, Mr. Cowgill, Defendants Sato and Lyon and Mr. Wilhelm met in person in New York to make presentations concerning the strategic plans of each company and discuss the potential benefits of a business combination in greater detail.

42.     On September 8, 2017, Mr. Cowgill telephoned Defendant Sato and advised Defendant Sato that the board of directors of JD Sports and Mr. Stephen Rubin, chairman of

Pentland Group plc ("Pentland"), JD Sports' majority shareholder, were supportive of Mr. Cowgill moving forward with further discussions with Finish Line.

43.     On September 11, 2017, counsel for Sports Direct contacted Mr. Eck concerning treatment under the rights plan of the direct holdings and derivative positions (both CFD's and short put options) of Sports Direct and its counterparty (Monecor (London) Limited, also known as ETX Capital ("ETX")) with respect to Common Shares. At Mr. Eck's request, the board of directors' outside counsel, Faegre Baker Daniels LLP ("FaegreBD"), posed written questions to counsel for Sports Direct concerning its derivative positions with respect to Common Shares and the derivative positions of ETX. After receiving responsive correspondence from Sports Direct (in which Sports Direct's counsel asserted that shares underlying its and ETX's existing short put options should be grandfathered under the rights plan) and ETX, a representative of FaegreBD had a call with a representative of ETX on September 13 to confirm the terms of the CFDs between ETX and Sports Direct and to discuss the terms of a potential standstill agreement between Finish Line and ETX.

44.     Also, on September 13, 2017, a research analyst published a report speculating that it was likely that Sports Direct would acquire Finish Line. Finish Line's closing stock price following the report on that date was $10.37, up from $9.74 on the prior date.

45.     On September 15, 2017, ETX communicated to a representative of FaegreBD requesting that Finish Line confirm that its preexisting short put option positions were "grandfathered" under the rights plan in exchange for a limited standstill agreement. According to ETX, such "grandfathering" was intended to clarify that ETX would be permitted to acquire direct ownership of Common Shares underlying its preexisting short put option positions without such acquisitions triggering the rights plan.

46.    On September 18, 2017, Finish Line's Board, at a special meeting, discussed the ETX proposal.  At the direction of the Board, FaegreBD declined to confirm favorable treatment under the rights plan of ETX's short put option positions absent a meaningful voting and standstill agreement from ETX.  ETX promptly requested reconsideration.

47.    In response to an e-mail inquiry from counsel for Sports Direct, on September 22, 2017, FaegreBD confirmed that Finish Line had not agreed to afford Sports Direct's short put option positions favorable treatment under the rights plan.

48.    On September 27, 2017, Defendant Sato had a telephone call with Mr. Cowgill to inquire about JD Sports' next steps in evaluating a potential business combination with Finish Line.  Defendant Sato also responded to questions posed by Mr. Cowgill about some of the material presented by Finish Line management at the September 6 meeting in New York.

49.    The morning of September 28, 2017, the *New York Post* published a story stating that Sports Direct was "in direct negotiations" to buy Finish Line and an acquisition could be announced "in coming weeks."

50.    Also, on September 28, 2017, Finish Line's Board met to discuss the possibility that, given market speculation, Finish Line would receive an unsolicited acquisition offer from Sports Direct or another potential acquirer, along with the possibility that Finish Line may receive an offer from JD Sports.

51.    On September 29, 2017, ETX contacted FaegreBD making further inquiry regarding treatment under the rights plan of ETX's short put option positions and the possibility of entering into a standstill agreement.  In response, FaegreBD confirmed Finish Line had not agreed that ETX's short put option positions were "grandfathered" under the rights plan.

52.     On October 1, 2017, Defendant Sato had a call with Mr. Cowgill to provide further clarification concerning Finish Line information about which Mr. Cowgill had inquired on the September 27 call.

53.     On October 12 and 13, 2017, the Special Committee of the Company met separately with representatives of each of PJ Solomon ("Solomon") and Houlihan Lokey ("Houlihan") to interview them to serve as financial advisers to the Special Committee.

54.     On October 13, 2017, Mr. Cowgill telephoned Defendant Sato to inform him that JD Sports was preparing a written indication of interest to purchase Finish Line that would be forthcoming shortly.

55.     On October 16, 2017, JD Sports sent a preliminary non-binding written indication of interest to acquire Finish Line at a price of $13.00 to $14.50 per share, subject to confirmatory due diligence.  JD Sports also requested a seven-week period of exclusivity to complete its due diligence and to negotiate a definitive merger agreement. Finish Line's closing stock price on that date was $10.15 per share.

56.     On October 18, 2017, Finish Line's Board met with representatives of Solomon and FaegreBD.  Solomon provided an overview of the retail footwear and sporting goods market segments as a whole, the preliminary proposal from JD Sports and other potential strategic and financial alternatives, including remaining an independent publicly-held company, and presented a preliminary financial analysis of Finish Line.

57.     FaegreBD advised the directors on their fiduciary duties in the strategic-review process, including in connection with a potential sale of Finish Line.  Immediately following the October 18 meeting of the Board, the Special Committee met with a representative of FaegreBD to discuss the engagement of financial advisers to the Special Committee.  At the end of the

discussion, the Special Committee determined to engage Solomon as its financial adviser, subject to the negotiation of a customary engagement letter. The Special Committee also determined to engage Houlihan to provide a second fairness opinion with respect to the consideration to be received by the holders of Common Shares in a potential sale of Finish Line (subject to the negotiation of a customary engagement letter), should the Special Committee determine to consider recommending such a transaction. The Special Committee then asked the representatives of Solomon to join the meeting to further discuss the proposal from JD Sports and the Special Committee's possible responses to that proposal. At the end of the discussion, the Special Committee directed Solomon to tell Barclays Bank plc ("Barclays"), JD Sports' financial adviser, that the Special Committee was willing to grant JD Sports a limited period of exclusivity in the belief that Finish Line's provision of additional non-public information would be expected to cause JD Sports to confirm its proposed valuation of Finish Line. The Special Committee also directed FaegreBD to negotiate an exclusivity agreement with JD Sports on substantially the terms discussed with the Special Committee.

58. During the meetings of Finish Line's Board and the Special Committee on October 18, 2017, a representative of Sports Direct sent an email to Mr. Eck stating that Sports Direct was seeking confirmation that its short put options were "grandfathered" under Finish Line's rights plan and reiterating Sports Direct's desire to engage in discussions with Finish Line regarding a potential commercial relationship. The Special Committee was advised during its meeting of the receipt of this email.

59. On October 19, 2017, Barclays contacted FaegreBD to introduce a representative of Hughes Hubbard & Reed LLP ("Hughes Hubbard"), advising that Hughes Hubbard would serve as U.S. legal counsel to JD Sports in connection with a potential transaction.

60.     Also, on October 19, 2017, during a teleconference among Sports Direct, its counsel Finish Line and FaegreBD, Sports Direct and its counsel told Finish Line that either Sports Direct is exempted from the rights plan or its short put option positions should be "grandfathered." Such communications also indicated Sports Direct continued to seek "commercial discussions" with Finish Line. Finish Line, through FaegreBD, declined commercial discussions with Sports Direct, noting Finish Line management is focused on other projects directed toward building shareholder value, and advised that Finish Line disagreed with Sports Direct's interpretation of the rights plan. Nevertheless, FaegreBD indicated Finish Line may be willing to afford special rights plan relief if Sports Direct were to sign a voting agreement undertaking to cooperate with the recommendations of Finish Line's Board.

61.     Following contact by a representative of Hughes Hubbard, representatives of Hughes Hubbard and FaegreBD discussed on October 23, 2017, the import of the reported Sports Direct positions in, and exposure to, Finish Line securities.

62.     On October 24, 2017, counsel for Sports Direct offered to provide a limited voting agreement but advised Finish Line that if Sports Direct's positions were not accepted by Finish Line, Sports Direct would file suit against Finish Line and "seek a declaratory judgement of the Indiana Court as to whether the short put options would be grandfathered under the original Rights Plan."

63.     On October 25, 2017, Finish Line entered into a formal engagement letter with Solomon confirming the engagement of Solomon as financial adviser to the Special Committee in connection with various strategic alternatives, including a potential sale of Finish Line.

64.     On October 27, 2017, counsel for Sports Direct affirmed that Sports Direct intended to file suit in Indiana to seek a declaratory judgment, claiming to have engaged Indiana counsel who was "drafting the complaint."

65.     On October 30, 2017, representatives of Barnes & Thornburg LLP ("Barnes & Thornburg"), counsel to Finish Line, contacted the representative of the Indiana law firm identified by counsel for Sports Direct and were not able to confirm that such firm had accepted engagement by Sports Direct.

66.     Also, on October 30, 2017, Finish Line and JD Sports entered into an agreement providing JD Sports with a period of exclusive negotiation rights through November 29, 2017, which period would automatically be extended through December 14, 2017 if JD Sports were actively pursuing the proposed acquisition of Finish Line in good faith as of November 29, 2017.

67.     On October 31, Finish Line provided JD Sports with access to an online data room of customary due diligence materials.

68.     On November 1, 2017, ETX filed an amendment of its Schedule 13G with the SEC reporting that it had sold Finish Line shares reducing its beneficial ownership from approximately 3.9 million Common Shares to approximately 2.9 million (representing approximately 7.3% of Finish Line's outstanding Common Shares).

69.     Also, on November 1, 2017, Sports Direct amended its Schedule 13D filing with the SEC disclosing that it had reduced its beneficial ownership of shares of Finish Line common stock from a number representing approximately 7.91% of Finish Line's outstanding Common Shares to a number representing approximately 3.7%. In addition, however, Sports Direct disclosed economic exposure to 10,745,581 Common Shares through CFDs (representing, in the

aggregate with the shares beneficially owned by Sports Direct, approximately 30.5% of the outstanding shares of Finish Line).

70.     On November 1, 2017, members of Finish Line management, including Defendant Sato and Messrs. Wilhelm and Eck, and representatives of each of Solomon and Barclays met in person in Chicago and gave a presentation to representatives of JD Sports regarding Finish Line and its strategic initiatives, operations and financial matters.

71.     On November 2, 2017, counsel for Sports Direct advised Barnes & Thornburg that Sports Direct was continuing to work with the Indiana counsel for a potential lawsuit against Finish Line, but emphasized that Sports Direct continued to have interest in commercial discussions with Finish Line for collaboration in the U.S.  At Finish Line's direction, a representative of Barnes & Thornburg responded to counsel for Sports Direct confirming that Finish Line would not engage in such discussions, particularly in view of Sports Direct's threat of litigation.

72.     On November 10, 2017, Finish Line formally engaged Houlihan Lokey to provide an opinion with respect to the fairness, from a financial point of view, of the consideration to be received by holders of Common Shares pursuant to a third-party acquisition proposal, should the Special Committee determine to consider recommending that alternative.

73.     Also, on November 10, 2017, Barnes & Thornburg and a representative of Indiana counsel for JD Sports discussed by telephone the application of Chapter 43 of the Indiana Business Corporation Law to potential transactions between Finish Line and Sports Direct or between Finish Line and JD Sports, respectively, and whether, depending on the underlying facts, Sports Direct, alone or with others, may be or have been a beneficial owner of more than 10% of the Common Shares, becoming an "interested shareholder," under that law, and therefore barred from engaging

in a business combination with Finish Line during a statutory moratorium. The conclusion was that additional information was needed as to the underlying facts.

74.    On November 15, 2017, representatives of Hughes Hubbard delivered an initial draft of the Merger Agreement to representatives of Barnes & Thornburg and FaegreBD.

75.    On November 22, 2017, a representative of Barnes & Thornburg provided to representatives of Hughes Hubbard a revised draft of the Merger Agreement and a proposed transaction timeline for discussion.

76.    On November 29, 2017, Finish Line and JD Sports executed an amendment of the Confidentiality Agreement to provide more specifically for protection of third party data.

77.    On November 30, 2017, representatives of Barnes & Thornburg and FaegreBD, Mr. Eck, and representatives of Hughes Hubbard participated in a teleconference to negotiate legal aspects of the Merger Agreement.

78.    On December 4, 2017, a representative of Hughes Hubbard provided a revised draft of the Merger Agreement to representatives of Barnes & Thornburg and FaegreBD.

79.    On December 5, 2017, the Special Committee held a meeting, which Defendant Sato and Messrs. Wilhelm, and Mr. Eck attended along with representatives of Solomon, FaegreBD, and Barnes & Thornburg. FaegreBD and Barnes & Thornburg reported to the Special Committee on the status of their negotiation of the Merger Agreement with Hughes Hubbard, noting that the principal open legal issues were the triggering events that could require Finish Line to pay a termination fee or expense reimbursement to JD Sports, the magnitude of such a fee or expense reimbursement, and certain provisions relating to the fiduciary duties of Finish Line's Board following the execution and delivery of the Merger Agreement. Solomon discussed the timing of the potential transaction, noting that the exclusivity period previously granted to JD

Sports was scheduled to expire on December 14, 2017. Defendant Sato noted that Mr. Cowgill had invited him to a meeting in the United Kingdom the next day to discuss the potential merger. The Special Committee directed Defendant Sato to attend the meeting, asking him to share the Special Committee's desire for greater certainty regarding the timing of a potential transaction as well as JD Sports' current views on the valuation of Finish Line. The meeting concluded with Mr. Wilhelm reporting on the preliminary financial results of Finish Line's recently completed third fiscal quarter.

80.     On December 6, 2017, Defendant Sato met with Mr. Cowgill in Manchester, United Kingdom. During the meeting, Defendant Sato answered a wide variety of financial and operational due diligence questions, and Defendant Sato and Mr. Cowgill discussed general industry conditions and trends.

81.     On December 8, 2017, the Special Committee held a meeting, which Defendant Sato, Mr. Wilhelm, and Mr. Eck attended along with representatives of Solomon and FaegreBD. Mr. Sato reported on his December 6 meeting with Mr. Cowgill and on the likely timing for a potential transaction and a firmer indication of value from JD Sports.

82.     Mr. Sato and Mr. Cowgill had further telephone calls on December 12 and December 13, 2017, during which Mr. Sato responded to further due diligence questions from Mr. Cowgill.

83.     On December 13, 2017, a representative of Barnes & Thornburg provided a revised draft of the Merger Agreement to Hughes Hubbard. The draft reflected that material open legal issues generally revolved around the size of, and triggers for, the termination fee that would be payable to JD Sports if Finish Line were to accept an unsolicited superior offer after signing of the Merger Agreement. Defendant Carmichael reported to the full Board on the status of discussions

with JD Sports, noting imminent expiration of the JD Sports exclusivity agreement and the absence of any firm proposal.

84.    On December 14, 2017, the Special Committee held a meeting, which Defendant Sato, Mr. Wilhelm, and Mr. Eck attended along with representatives of Solomon, FaegreBD, and Barnes & Thornburg.  Defendant Sato reported on the timing of the potential transaction and on the status of JD Sports' due diligence investigation.  Representatives of Solomon discussed certain illustrative financial analyses.  The Special Committee instructed Defendant Sato to contact Mr. Cowgill to inquire about JD Sports' plans and proposed timing in view of the expiration of the exclusivity period.  Later that day, Defendant Sato called Mr. Cowgill to discuss the status of JD Sports' plans and timing.  At the end of that day, Finish Line's exclusivity agreement with JD Sports expired and was not extended by the parties.

85.    On December 15, 2017, Mr. Cowgill called Defendant Sato to provide further clarification from JD Sports' board of directors regarding anticipated transaction timing.

86.    After the period of exclusivity with JD Sports lapsed, the Special Committee, after hearing from Solomon, decided not to contact other potential bidders.  Solomon advised Finish Line on a number of strategic opportunities and initiatives over recent years and was very familiar with Finish Line, its industry and potential strategic partners, as well as potential private equity investors.  The Special Committee determined that there were unlikely to be alternative bidders that would be both viable and competitive with the transaction being proposed by JD Sports.  In addition, notwithstanding public speculation in the media that Finish Line was in merger talks, no inquiries had been forthcoming from any other potential bidder.

87.    On December 19, 2017, Sports Direct filed an amendment of its Schedule 13D with the SEC reporting the sale of options (granting third parties the right to buy shares from Sports

Direct) for 1,480,000 shares (representing approximately 3.7% of Finish Line's outstanding shares. Defendant Sato called Mr. Cowgill on December 20, 2017 to request a further update on JD Sports' progress toward a more formal offer and planning considerations. JD Sports is listed on the London Stock Exchange and thus subject to the UK Listing Rules. The proposed transaction, because of the size of the acquisition of Finish Line in relation to JD Sports, would be a Class 1 transaction under the UK Listing Rules and would therefore be subject to, among other things, approval of the shareholders of JD Sports by simple majority of votes cast in favor of the transaction. Finish Line requested that Pentland, majority shareholder of JD Sports, would deliver an irrevocable undertaking to JD Sports to vote its JD Sports shares in favor of the transaction at the JD Sports shareholder meeting that would vote on the transaction. In connection therewith, Mr. Cowgill offered to arrange a meeting between Defendant Sato and Mr. Rubin to occur in Florida in early January to obtain greater insight into whether Pentland had views of the proposed transaction.

88.    On December 21, 2017, Finish Line reported its earnings for its recently-completed third fiscal quarter. Finish Line's closing stock price on that date was $13.20 per share, up from $11.69 at the close of the prior day.

89.    On January 3, 2018, Defendant Sato met in Florida with Mr. Rubin to discuss Finish Line's perspective on the proposed transaction. Without engaging in any specific discussion, Mr. Rubin stated that he continued to support the proposed acquisition of Finish Line by JD Sports, despite the recent increase in Finish Line's stock price, but he also noted a desire to avoid JD Sports taking on too much debt in connection with an acquisition. Defendant Sato suggested that representatives of Finish Line and of JD Sports analyze potential structures for financing the acquisition, including the possible use of untapped debt capacity at Finish Line. Later that day,

Defendant Sato called Mr. Cowgill to relay the substance of Defendant Sato's meeting with Mr. Rubin.

90.     On January 4, 2018, Mr. Wilhelm and representatives of Solomon had a telephone call with representatives of JD Sports to discuss possible financing structures to facilitate the potential acquisition.

91.     Defendant Sato called Mr. Cowgill on January 10, 2018, to obtain an update on JD Sports' progress toward making a formal offer for Finish Line.

92.     On January 11, 2018, the Special Committee held a meeting, which Defendant Sato, Mr. Wilhelm, and Mr. Eck attended along with representatives of Solomon, FaegreBD, and Barnes & Thornburg.  Defendant Sato reported on his recent discussions with Messrs. Rubin and Cowgill, and Mr. Wilhelm and representatives of Solomon reported on the progress that JD Sports had made on financing of the potential acquisition.

93.     Beginning in late September 2017, Mr. Eck and Mr. Wilhelm received and responded, from time to time, to routine investor phone and email inquiries from Liam Rowley, Sports Direct's director of strategic investment.

94.     On January 18, 2017, Mr. Rowley visited Finish Line in Indianapolis. Mr. Eck and Mr. Wilhelm met him for lunch and toured a local Finish Line store.  Discussions were limited to publicly available information.

95.     On January 23, 2018, Mr. Cowgill telephoned Defendant Sato and informed him that the board of directors of JD Sports had affirmed continued support for the potential transaction. Defendant Sato posed clarifying questions regarding JD Sports' expectations in terms of timing. Mr. Cowgill phoned Defendant Sato on January 26, 2018, to clarify JD Sports' expectations after conferring with JD Sports' board of directors and Mr. Rubin.

96.    On February 2, 2018, Finish Line's Board held a meeting, which Messrs. Wilhelm and Eck attended along with representatives of FaegreBD and Barnes & Thornburg.  During the meeting, Mr. Carmichael and Defendant Sato gave an update regarding JD Sports' due diligence investigation of Finish Line, including a series of in-person diligence meetings planned to occur in Indianapolis during the week of February 5.

97.    During the last week of January and the first two weeks of February 2018, Barnes & Thornburg, FaegreBD and Hughes Hubbard continued negotiations on the Merger Agreement and other transaction documentation.

98.    On February 5, 2018, representatives of JD Sports, Hughes Hubbard, Barnes & Thornburg, FaegreBD and Mr. Eck met in Indianapolis to negotiate open issues under the Merger Agreement and ancillary documents.  During the week of February 5, 2018, representatives of JD Sports and Barclays held a number of due diligence meetings with Finish Line's executive officers and their advisors in Indianapolis.

99.    On February 7, 2018, Defendant Sato and Mr. Wilhelm met with Mr. Cowgill and other representatives of JD Sports to respond to due diligence questions and to review the fourth quarter fiscal 2018 financial projection.

100.    On February 13, 2018, internal counsel for JD Sports communicated a number of comments on Finish Line's most recent draft of the Merger Agreement to Mr. Eck.

101.    On February 16, 2018, JD Sports, citing concerns regarding Finish Line's financial performance for its fiscal 2018 fourth quarter currently underway and the ability of Finish Line to meet management's financial projections for its fiscal year ending February 2018, sent a revised non-binding written indication of interest to acquire Finish Line at price of $11.50 per share and proposing that the definitive Merger Agreement would contain a termination fee payable to JD

Sports equal to 5% of the transaction value in certain circumstances. Finish Line's closing stock price on that date was $10.15 per share.

102. On the instructions of the Special Committee, between February 17 and 19, 2018, representatives of Solomon held a number of calls with Mr. Cowgill to discuss JD Sports' revised proposal. The Solomon representatives advised Mr. Cowgill that the Special Committee did not find the proposal a suitable basis for continued discussions. In response, Mr. Cowgill expressed a willingness to discuss potential improvements in the proposed valuation of Finish Line.

103. On February 20, 2018, Sports Direct filed an amendment to its Schedule 13D with the SEC reporting acquisition of 1,000,000 Common Shares upon exercise of short put options, raising its direct ownership percentage to 3,972,100 Common Shares (representing approximately 9.9% of Finish Line's outstanding shares). In addition, Sports Direct disclosed an economic interest in 8,856,181 Common Shares through CFDs (representing, in the aggregate with the shares beneficially owned by Sports Direct, approximately 31.8% of the outstanding shares of Finish Line).

104. On February 22, 2018, the Special Committee held a meeting, which Defendant Sato and Mr. Wilhelm attended along with representatives of Solomon and FaegreBD. Messrs. Sato and Wilhelm reported on Finish Line's recent financial performance in the current fourth fiscal quarter and on management's revised preliminary financial projections for the fiscal year ending February 2019. Representatives of Solomon analyzed JD Sports' February 16 proposal in the context of certain illustrative financial analyses. At the conclusion of the discussions, the Special Committee directed Solomon to make a counter proposal to JD Sports for the acquisition of Finish Line at $13.75 per share and a termination fee of 3% of the transaction value. A

representative of Solomon conveyed the counterproposal to Mr. Cowgill by telephone later that day. Finish Line's closing stock price on that date was $10.35 per share.

105. On February 28, 2018, Mr. Cowgill called Solomon to gauge the Special Committee's willingness to consider a revised proposal of $12.50 per share. The representatives of PJ SOLOMON indicated their belief that the Special Committee would not look favorably upon that valuation.

106. On March 5, 2018, Mr. Cowgill called Solomon to state that the board of directors of JD Sports may be willing to consider a revised proposal of $12.50 to $12.75 per share. Based on directions provided by the Special Committee, the representatives of Solomon indicated that the Special Committee would expect JD Sports to offer no less than the low end of the range that JD proposed in its initial indication of interest on October 16, 2017.

107. On March 6, 2018, Mr. Cowgill called Solomon to state that the board of directors of JD Sports had authorized him to convey a revised offer of $13.00 per share. Finish Line's closing stock price on that date was $10.95 per share.

108. On March 7, 2018, the Special Committee held a meeting, which Defendant Sato, Mr. Wilhelm, and Mr. Eck attended along with representatives of Solomon, Houlihan Lokey, and FaegreBD. Mr. Wilhelm reported on Finish Line's preliminary financial results for its recently-completed fourth fiscal quarter and on management's revised preliminary financial projections for the fiscal year ending February 2019. Representatives of Solomon analyzed JD Sports' March 6 proposal in the context of certain illustrative financial analyses. At the conclusion of the discussions, the Special Committee directed Solomon to make a final counter proposal to JD Sports for the acquisition of Finish Line at $13.50 per share, a termination fee of 4% of the transaction

value, and a deadline for JD Sports to accept the Special Committee's proposal no later than March 9.

109.    Solomon conveyed the Special Committee's counter proposal to Mr. Cowgill later that day. Finish Line's closing stock price on that date was $10.46 per share.

110.    Between March 8 and March 19, 2018, there were frequent communications between Solomon and Mr. Cowgill and, secondarily, representatives of Barclays, by telephone and email regarding the status of JD Sports' evaluation of Finish Line's counterproposal and to respond to questions from JD Sports.

111.    On March 19, 2018, Mr. Cowgill called Solomon to state that the board of directors of JD Sports had authorized him to convey a revised offer of $13.50 per share so long as the definitive Merger Agreement would contain a termination fee payable to JD Sports equal to 5% of the transaction value. Finish Line's closing stock price on that date was $10.36 per share.

112.    Between March 19 and 24, 2018, after consultation with Mr. Carmichael, Finish Line, Barnes & Thornburg and FaegreBD reengaged with JD Sports and Hughes Hubbard on the negotiation and preparation of the Merger Agreement and the other transaction documents. During this period, with the authorization of the Special Committee, Finish Line's management discussed employee incentive arrangements and communication plans relating to the transaction announcement with JD Sports management.  Finish Line also provided JD Sports with additional confirmatory diligence information that had previously been withheld due to its commercially sensitive nature.

113.    On March 21, 2018, Defendant Sato and Mr. Wilhelm reviewed and presented to the Board a financial projection for fiscal year 2018, 2019, 2020 and 2021. The Board approved the three-year plan as presented.

114.    After initial discussions as to whether Pentland would be willing to deliver the aforementioned irrevocable undertaking, counsel for JD Sports in a teleconference with counsel for Finish Line advised on March 23, 2018 that Pentland would be willing to do so, provided that its voting obligations would not apply in the event the JD Sports board of directors changed its recommendation to vote in favor of the transaction. Following discussion by counsel to JD Sports and counsel to Finish Line, the Special Committee deliberated and objected to Pentland's proposed qualification.  Solomon so advised JD Sports.

115.    On March 24, 2018, Finish Line's Board and the Special Committee held a joint meeting, which Messrs. Wilhelm and Eck attended along with representatives of Solomon, Houlihan Lokey, Barnes & Thornburg, and FaegreBD.  Representatives of Barnes & Thornburg and FaegreBD summarized the material terms and conditions of the Merger Agreement and related ancillary documents and advised the directors regarding their fiduciary duties in the context of a sale of Finish Line. Representatives of Solomon reviewed and discussed their financial analyses and representatives of Houlihan Lokey reviewed and discussed their preliminary financial analyses with respect to the $13.50 per-share consideration offered by JD Sports with the Special Committee and the Board.

116.    The Board and the Special Committee discussed the proposed merger and the Merger Agreement (including Pentland's proposed qualification of its irrevocable undertaking) in light of the prospects of Finish Line continuing as a stand-alone public company.  At the conclusion of the discussion, Finish Line's Board and the Special Committee directed Finish Line's legal advisers to confirm to JD Sports that, in order to be willing to enter into the Merger Agreement and to recommended approval of the Merger Agreement to Finish Line's shareholders, they would require JD Sports to deliver to Finish Line an irrevocable undertaking from Pentland to the effect

that it would vote its JD Sports shares in favor of the transaction and against any resolution, proposal or motion that the approval of the transaction by the shareholders of JD Sports be withdrawn or otherwise not be voted on, without the aforementioned qualification of such voting obligations requested by Pentland. Moreover, Finish Line's Board and the Special Committee directed Finish Line's legal advisers to finalize the Merger Agreement and related documents on the terms directed by the Board and the Special Committee, in order to be prepared should Pentland agree to concede the requested qualification of its voting obligations. In a teleconference, JD Sports, its counsel and counsel to Finish Line further discussed the request by Finish Line's Board and the Special Committee with respect to the irrevocable undertaking.

117. On Sunday, March 25, 2018, at the request of the boards of directors of JD Sports and Finish Line and the Special Committee, Pentland agreed to deliver the irrevocable undertaking without the aforementioned qualification. JD Sports advised Solomon of this outcome. Barnes & Thornburg and FaegreBD worked with Hughes Hubbard to finalize the Merger Agreement and related documents on the terms directed by Finish Line's Board and the Special Committee. Later that day, Finish Line's board of directors and the Special Committee held a joint meeting, which Messrs. Wilhelm and Eck attended along with representatives of Solomon, Houlihan Lokey, Barnes & Thornburg, and FaegreBD. At the meeting:

> Barnes & Thornburg and FaegreBD summarized the resolution of the final terms and conditions of the Merger Agreement and related documents Representatives of Solomon delivered to the Special Committee an oral opinion, which was confirmed by delivery of a written opinion dated March 25, 2018, to the Special Committee that, as of that date and based upon and subject to various assumptions and limitations described therein, the Merger Consideration to be paid to the holders of Common Shares (other than JD Sports and its affiliates) pursuant to the Merger Agreement was fair, from a financial point of view, to such holders.
>
> Representatives of Houlihan Lokey reviewed and discussed its financial analyses (which had been updated to reflect market closing prices as of March 23, 2018) with the Special Committee and the Board. T hereafter, at the request of the Special

Committee, Houlihan Lokey verbally rendered its opinion to the Special Committee (which was subsequently confirmed in writing by delivery of Houlihan Lokey's written opinion addressed to the Special Committee dated March 25, 2018), as to the fairness from a financial point of view of the consideration to be received by the holders of Common Shares (other than JD Sports and its affiliates) in the merger pursuant to the Merger Agreement.

Representatives of Solomon delivered to the Special Committee an oral opinion, which was confirmed by delivery of a written opinion dated March 25, 2018, to the Special Committee that, as of that date and based upon and subject to various assumptions and limitations described therein, the Merger Consideration to be paid to the holders of Common Shares (other than JD Sports and its affiliates) pursuant to the Merger Agreement was fair, from a financial point of view, to such holders.

Representatives of Houlihan Lokey reviewed and discussed its financial analyses (which had been updated to reflect market closing prices as of March 23, 2018) with the Special Committee and the board of directors. Thereafter, at the request of the Special Committee, Houlihan Lokey verbally rendered its opinion to the Special Committee (which was subsequently confirmed in writing by delivery of Houlihan Lokey's written opinion addressed to the Special Committee dated March 25, 2018), as to the fairness from a financial point of view of the consideration to be received by the holders of Common Shares (other than JD Sports and its affiliates) in the merger pursuant to the Merger Agreement.

**The Proposed Merger**

118. On March 26, 2018, the Company issued a press release that announced the Proposed Merger. The Company's press release stated:

INDIANAPOLIS--Mar. 26, 2018-- Athletic retailer The Finish Line, Inc. (NASDAQ: FINL) announced today that it has entered into a merger agreement providing for JD Sports Fashion Plc (LSE: JD) to acquire 100% of the issued and outstanding Finish Line shares at a price of $13.50 per share in cash representing an aggregate deal value of approximately $558 million. JD is the leading European retailer of sports, fashion and outdoor brands.

"The Special Committee appointed by the Finish Line board recommended and the board voted unanimously to approve entering into this merger agreement," said Bill Carmichael, Chairman of the Special Committee and Lead Director of the Finish Line Board of Directors. "With JD, Finish Line achieves immediate value for its shareholders and moves into a stronger position to compete as part of a global enterprise that leads in our industry."

"Finish Line has long admired JD and their commitment to serve customers with premium brands through a unique and innovative retail experience," said Sam Sato,

Chief Executive Officer of Finish Line. "We are thrilled to partner with them and look forward to realizing the impact we will have on the marketplace together."

"We are extremely excited to be joining up with Finish Line, a well-established US operator," said Peter Cowgill, Executive Chairman of JD. "The acquisition represents an excellent opportunity for JD to establish its market leading multibrand proposition in the world's largest athleisure market. It immediately offers a major presence in the US, a clear next step to further increase our global scale. Finish Line has many similarities to JD with a strong bricks and mortar offering complemented by an advanced and well-invested digital platform. We are looking forward to working with Finish Line's experienced management team to bring best in class retail theatre to the US. Our combined extensive knowledge of the retail market and our product and marketing relationships with global brand partners will benefit our customers, in turn supporting the continued future growth of JD."

**Transaction Highlights**

•       The terms of the merger represent a premium of 28 percent for Finish Line shareholders compared to the closing price of Finish Line's shares of $10.55 as of March 23, 2018.

•       This provides an excellent strategic fit for Finish Line and JD. Finish Line moves into a stronger position to compete as part of a global enterprise that leads in the industry. JD gains a significant physical and online retail presence with direct access in the US which they have long identified as a highly attractive growth opportunity.

•       Finish Line and JD together create a leading global, premium, multichannel retailer of sports, fashion and outdoor brands who embraces the latest online and in-store digital technology.

•       The combined purchasing power of Finish Line and JD, coupled with the strategic alignment with major international sportswear brands in North America, is expected, on completion, to enable the enlarged group to bring a highly differentiated multi-channel retail proposition to the US market.

•       Upon closing of the agreement, the Finish Line executive team will continue their involvement with the business.

The merger agreement is subject to Finish Line and JD shareholder approval of the merger, the receipt of all required regulatory approvals, and the satisfaction of other customary conditions to closing. The expected timeline to close on this agreement is no earlier than June 2018.

**The Unique Benefits to Company Insiders in the Proposed Merger**

119.     Finish Line and JD Sports insiders are the primary beneficiaries of the Proposed

Merger.  The Board and the Company's executive officers are conflicted because they will have

secured unique benefits for themselves from the Proposed Merger, which is not available to

Plaintiff and the shareholders of the Company.

120.     Company management is securing positions for themselves upon consummation of

the Proposed Merger.  Pursuant to the Registration Statement:

> JD Sports and Finish Line have commenced an integration planning process to
> determine the employment status of Finish Line's executive officers following the
> effective time of the merger. Additional decisions regarding the employment status
> of Finish Line's executive officers are expected to be made closer to, or after, the
> closing of the merger. As a result, at this time the current employment agreements
> with Mr. Sato, Mr. Wilhelm, Ms. Greenwell, Mr. Hall, and Mr. Sutera are expected
> to remain in effect unless and until terminated or amended in connection with the
> integration planning process with JD Sports.

Registration Statement at 70.

121.     The Company insiders will reap substantial benefits for securing the deal with JD

Sports.  Under the terms of the Company's long-term incentive bonus programs, each of the

Company's executive officers will receive an acceleration of their bonus awards upon

consummation of the Proposed Merger:

| Executive Officer | Fiscal Year 2017 Bonus Program Award | Fiscal Year 2018 Bonus Program Award |
|---|---|---|
| Samuel M. Sato | $162,500 | $250,000 |
| Edward W. Wilhelm | $97,500 | $150,000 |
| Melissa Greenwell | $97,500 | $150,000 |
| John Hall | $92,083 | $150,000 |
| AJ Sutera | $97,500 | $150,000 |

122.     AJ Sutera will receive additional cash bonus awards in connection with the

Proposed Merger in the amount of $1,000,000.

123.     In addition, if these insiders are terminated in connection with the Proposed Merger, the Company's named executive officers are set to receive substantial cash payments in the form of golden parachute compensation:

| Executive | Cash ($) | Equity[1] ($) | Perquisites/ Benefits[2] ($) | Total ($) |
|---|---|---|---|---|
| Samuel M. Sato | $6,187,500[3] | $3,436,722[8] | $ 32,404 | $9,656,626 |
| Melissa A. Greenwell | $2,216,250[4] | $ 550,044[9] | $ 23,789 | $2,790,083 |
| Edward W. Wilhelm | $2,566,250[5] | $ 657,456[10] | $ 32,404 | $3,256,110 |
| John J. Hall | $3,020,208[6] | $ 822,407[11] | $ 32,404 | $3,875,019 |
| AJ Sutera | $3,106,875[7] | $ 519,480[12] | $ 32,404 | $3,658,759 |

Golden Parachute Compensation

## FALSE AND MISLEADING REGISTRATION STATEMENT

124.     Defendants filed a materially misleading Registration Statement and disseminated it to the Company's shareholders.  The Registration Statement omits material information that is necessary for the Company's shareholders to make an informed decision whether to vote their shares in favor of the Proposed Merger.

125.     The Registration Statement does not provide Company shareholders the following: (i) the Company's financial projections, relied upon by the Company's financial advisors Solomon and Houlihan; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by Solomon and Houlihan; and (iii) potential conflicts of interest.

**Solomon's Analysis**:

126.     Selected Public Companies: Solomon selected four (4) comparable companies in each of two groups – Footwear Retailers and Sporting Goods Retailers and compared the multiples at which they trade relative to:  EBITDA and EPS.

127. Solomon "selected" a multiple range (4.5x – 5.5x) to value Finish Line based on EBITDA that were at or near the medians for both groups. However, it "selected" EPS multiples (P/E multiples) to value Finish Line that were below the median (9.5x – 12.5x) and (9.0 – 12.0x.). There is no basis provided for selecting a lower range based on EPS to value Finish Line.

128. Further, the Sporting Goods Retailers overall have lower P/E multiples than the Footwear Retailers. The Sporting Goods Retailers group is not relevant, given that Finish Line's SIC Code is 5661 = Shoe Stores and its NAICS Code is 448210 = Shoe Stores. More than 71% of its revenues is from selling Nike brand shoes.

129. Solomon derives a public company value for Finish Line by tossing the high and low values and arrives at $7.15 to $14.21 per share. It then applies a control premium of 30.7% (based on prior transactions) to arrive at control value of $9.35 to $18.57. If it only relied on the numbers from the comparison to Footwear Retailers, the valuation range including control would be $16.08 to $18.57.

130. <u>Selected Precedent Transactions</u>: Solomon only looked at four (4) transactions (small sample) and all four (4) reflect a non-strategic (private equity) buyer. JD Sports is a strategic buyer that wants to get a foothold in the U.S. market and therefore may have been willing to pay more. Sycamore, the buyer on 2 of the 4 deals, seeks to acquire underperforming retailers at low prices. This is not the case here. None of the LTM EBITDA multiples are provided for the 4 deals. The only information provided is the range of multiples which was 4.7x to 7.7x.

131. Solomon then "selected" a range of 4.5x to 7.5x, which is below the deal range, to arrive at fair value for FL of $12.03 - $18.79 per share. Solomon should disclose all the deal multiples. In fact, Houlihan says there are no relevant transactions and thus they did not use this analysis.

132. <u>Discounted Cash Flow</u>:  The Free Cash Flow ("FCF") projections used by Solomon are not provided in the Registration Statement.  The Registration Statement provides other metrics including EBITDA, EBIT, and CapEx, but without "Finish Line provided projected tax rate" one cannot derive FCF.

133. Further, there is no explanation for the discount rate range of 11-13%.  The Registration Statement fails to provide assumptions Solomon used to derive including Equity Risk Premium and Beta.

**Houlihan's Analysis**:

134. <u>Selected Public Companies</u>:  Houlihan also selected peer companies from two (2) groups – Footwear Retailers and Sporting Goods Retailers and compared the multiples at which they trade relative to projected EBITDA.  The EBITDA multiples for the Footwear Group are higher than for the Sporting Goods Retailers.  Footwear mean and medians 5.5x – 5.9x; Sporting Goods mean and medians 4.9x – 5.1x.   Again, Sporting Goods Retailers only brings the average down and is not relevant.

135. Houlihan's "selects" a range of 3.5x – 5.5x for Finish Line.

136. <u>Discounted Cash Flow</u>:  Similar to Solomon, there are no FCF projections and no metrics used to derive discount rate range of 10-12%.

**FALSE STATEMENTS CONCERNING POTENTIAL CONFLICTS OF INTEREST**

137. The Registration Statement dies not disclose information concerning potential conflicts of interest faced by the Company's financial advisor, Houlihan.

138. For example, the Registration Statement sets forth that:

Houlihan Lokey and certain of its affiliates have in the past provided financial advisory and/or other financial or consulting services to Finish Line and an affiliate of JD Sports, for which Houlihan Lokey and its affiliates have received compensation, including, among other things, having provided certain strategic

consulting services to Finish Line. Houlihan Lokey and certain of its affiliates received aggregate fees for such services from Finish Line and its affiliates of approximately $390,000 in the two years preceding the date of Houlihan Lokey's opinion and aggregate fees for such services from an affiliate of JD Sports of approximately $250,000 during such period. *See* Registration Statement at 61.

139. The Registration Statement does not disclose the specific services Houlihan performed for JD Sports. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

140. The Registration Statement also does not disclose information concerning potential conflicts of interest faced by the Company's directors and executive officers.

## CLAIMS FOR RELIEF

### COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a)
of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

141. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

142. SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

143. Defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

144.    Defendants were aware of this information and of their duty to disclose this information in the Registration Statement.  The Registration Statement was prepared, reviewed, and/or disseminated by Defendants.  The Registration Statement misrepresented and/or omitted material facts as described above.  Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

145.    The omissions and false and misleading statements in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to unitholders.

146.    By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

147.    Because of the false and misleading statements in the Registration Statement, Plaintiff and the putative Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

### COUNT II

**Class Claims Against the Individual Defendants for**
**Violation of Section 20(a) of the Exchange Act**

148.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

149.    The Individual Defendants acted as controlling persons of Finish Line within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as

officers or directors of Finish Line and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

150.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

151.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same. The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were, thus, directly involved in the making of this document.

152.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Merger.

153.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

154.    Plaintiff and the putative Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the putative Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)    Declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

(B)    Declaring that the Registration Statement is materially false or misleading;

(C)    Enjoining, preliminarily and permanently, the Proposed Merger;

(D)    In the event that the Proposed Merger is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the putative Class rescissory damages;

(E)    Directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(F)    Awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)    Granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 24, 2018

**PAVLACK LAW, LLC**

By:    */s/ Eric S. Pavlack*
Eric S. Pavlack, #21773-49
Colin E. Flora, #29914-49
9011 N. Meridian St., Ste. 203
Indianapolis, Indiana 46260

Tel: (317) 251-1100
Fax: (317) 252-0352
Email: Eric@PavlackLawFirm.com
Email: Colin@PavlackLawFirm.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: 212-983-1300
Facsimile: 212-983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*